IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FIRST MIDWEST BANK, an Illinois banking corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 18-cv-05872 |
| -vs- | ) ) | Judge |
| RMG SPORTS GROUP LLC, a Florida limited liability company, ROBERT M. GARBER, an  individual, | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, FIRST MIDWEST BANK ("First Midwest" or "Plaintiff"), for its complaint against Defendants, RMG SPORTS GROUP LLC ("RMG Sports") and ROBERT M. GARBER ("Garber" and, together with RMG Sports, the "Defendants"), states as follows:

## THE PARTIES

1.     First Midwest is an Illinois banking corporation with its principal place of business in Chicago, Illinois.

2.     RMG Sports is a Florida limited liability company with its principal place of business located at 2383 Flamingo Drive in Miami Beach, Florida.

3.     Garber is an individual who is a citizen of and resides in Florida.  Garber owns and operates RMG Sports.

4.     Garber has been and is a sports agent.  Among other credentials, he has been certified to act in that capacity on behalf of players who are members of the Major League Baseball Players Association (the "MLBPA").  Garber has done so through RMG Sports.

## JURISDICTION AND VENUE

5.      This Court has diversity subject matter jurisdiction over this lawsuit under 28 U.S.C. §§ 1332(a)(1) as this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.      This Court has personal jurisdiction over each of the parties to this matter. RMG Sports and Garber have conducted and conduct business in Illinois.  RMG Sports and Garber are subject to personal jurisdiction in accordance with Illinois' long-arm statute, which provides, in relevant part:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts: (1) The transaction of any business within this State . . . .

735 ILCS 5/2-209(a).

7.      This Court is the proper venue for this lawsuit under 28 U.S.C. § 1391(a) because the events giving rise to First Midwest's claim against RMG Sports and Garber occurred in this judicial district. Moreover, both RMG Sports and Garber agreed to venue in counties that are within this judicial district in loan documents to which reference is made below.

## BACKGROUND

### First Midwest's Loans to RMG Sports and Garber's Guaranty

8.      From and after 2012, First Midwest has been a lender to Garber and companies wholly owned by Garber.

9.      RMG Sports and First Midwest are parties to a Business Loan Agreement (Asset Based) dated September 5, 2016, pursuant to which First Midwest extended financing and

made loans in the aggregate principal amount of up to $1,200,000 to RMG Sports, secured by the assets of RMG Sports (the "2016 Loan Agreement").

10.     RMG Sports is the obligor on a note dated September 5, 2017 in favor of First Midwest in the principal amount of $1,200,000 and having the maturity date of September 5, 2018 (the "2017 Note").

11.     The 2017 Note replaced a note dated September 5, 2016, with a maturity date of September 5, 2017 (the "2016 Note" and, together with the 2017 Note, the "Notes").

12.     RMG Sports executed a Commercial Security Agreement (the "Security Agreement" and, together with the 2016 Loan Agreement and the Notes, the "Loan Documents") in favor of First Midwest.

13.     Pursuant to the Security Agreement, RMG Sports granted First Midwest a security interest in, among other things, its then-existing and after-acquired inventory, equipment, accounts, chattel paper, instruments, letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles, as well as the proceeds of the foregoing (the "Collateral"). Pursuant to the Security Agreement, the Collateral secures payment of all of RMG Sports' obligations to First Midwest, whether or not arising out of or related to the Note.

14.     First Midwest properly perfected its security interest in the Collateral by timely filing a UCC-1 financing statement with the Florida Secretary of State. On information and belief, First Midwest's security interest in the Collateral is prior to any other security interest therein.

15.     In order to induce First Midwest to enter into and perform under the 2016 Loan Agreement, Garber executed a Commercial Guaranty in favor of First Midwest (the "Guaranty").

16.     All obligations of RMG Sports to First Midwest are within the scope of the Guaranty.

17.     As of August 6, 2018, principal, interest and fees and expenses were due on the 2017 Note in the following amounts, respectively:   Principal: $1,181,669.04, Interest: $29,427.76, Late charges: $1,240.56, and Legal fees: $4,118.40.

18.     As a condition of obtaining financing and loans from First Midwest under the 2016 Loan Agreement, Garber was required to provide evidence of accounts receivable to be collected by RMG Sports.  These accounts receivable were part of the Collateral securing the financing and loans extended by First Midwest.

19.     During 2016 and 2017, Garber provided First Midwest with written documents setting forth what were described therein as the accounts receivable that RMG Sports would collect going forward.   First Midwest reasonably relied on the information in these documents provided by Garber in extending financing and loans to RMG Sports.

## FACTS

### Garber Provides False Oral and Written Information to First Midwest and Obtains an Extension of Maturity and Further Financing

20.     Prior to September 5, 2017, Garber induced First Midwest to extend the maturity of the note obligations under the 2016 Loan Agreement from September 5, 2017 to September 5, 2018.   Garber did so, in part, by providing written documents (the "2017/18 Accounts Receivable Statement") to First Midwest setting forth what were described as the accounts receivable that RMG Sports would collect from and after September 5, 2017.   Garber

-4-

represented to First Midwest that RMG Sports expected to collect $1,694,900 in accounts receivable during 2017 and $3,112,500 during 2018.

21.     First Midwest reasonably relied on the documents provided to First Midwest by Garber, including, but not limited to, the 2017/18 Accounts Receivable Statement.

22.     As a result of its reasonable reliance as described above, First Midwest i) agreed to extend the maturity of RMG Sports' obligations to September 5, 2018 and ii) continued to provided financing and loans to RMG Sports under the 2016 Loan Agreement and the 2017 Note.

23.     Garber knew that the 2017/18 Accounts Receivable Statement contained materially false information when it was provided to First Midwest.  Garber intentionally provided the 2017/18 Accounts Receivable Statement to First Midwest, with the intention that First Midwest would extend the maturity of RMG Sports' borrowings to September 5, 2018 and continue to provide financing and loans under the 2016 Loan Agreement.

24.     At least $350,000 of the accounts receivable set forth in the 2017/18 Accounts Receivable Statement had already been collected prior to Garber's delivery of the 2017/18 Accounts Receivable Statement, and ii) at least $400,000 of accounts receivable set forth in the 2017/18 Accounts Receivable Statement (which were described by Garber in November 2017 as collectible) were written off by RMG Sports as uncollectible on or before November 28, 2017.

**Garber Misappropriates the Proceeds of Collateral Securing RMG Sports' Obligations to First Midwest at a Time When RMG Sports is Insolvent**

25.     On information and belief, prior to and after September 5, 2017, Garber used the proceeds of collateral securing RMG Sports' obligations to First Midwest for his own personal expenses and purposes, thus diverting and converting such proceeds.

26. On information and belief, at the time of such diversions and conversions, RMG Sports was insolvent. Garber was aware at each such times of RMG Sports' insolvency.

27. At the time of such diversions and conversions, Garber, as an officer and manager of RMG Sports, owed a fiduciary duty to serve the interests of the creditors of RMG Sports, including First Midwest.

28. As a result, the obligations of RMG Sports to First Midwest were not reduced as they should have been.

**Garber Conceals Material Bad News from First Midwest**

29. Prior to September 5, 2017, Garber informed First Midwest that he represented J.D. Martinez and numerous other players who were members of the MLBPA.

30. At some point prior to November 1, 2017, Garber became aware that J.D. Martinez would no longer be using him as his agent, and in particular, that Garber would not represent him in connection with negotiation of his next contract, which contract he would sign between the end of the 2017 baseball season and the beginning of the 2018 baseball season. Martinez was, at the time, one of the most sought-after free agents in Major League Baseball.

31. Garber did not inform First Midwest with regard to the end of his representation of Mr. Martinez until April 9, 2018, during a conversation in which he stated that due to the loss of his largest client, he did not know how he would be able to repay his obligations, and had hired bankruptcy counsel.

32. On November 1, 2017, published reports stated that J.D. Martinez had become a client of Scott Boras, a prominent agent.

**Garber Continues to Intentionally Deceive by Providing False Information**

33.     In November 2017, Garber informed First Midwest, orally and in writing, that the 2017/18 Accounts Receivable Statement was still accurate, notwithstanding the bad news that had become public.  First Midwest reasonably relied on these representations from Garber.

34.     RMG Sports' false statements to First Midwest, as described above, constitute an Event of Default under the Security Agreement.  In particular, the Security Agreement provides on Page 4: "Each of the following shall constitute an Event of Default under this Agreement . . . . **False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter."  RMG Sports' false statements in the 2017/18 Accounts Receivable Statement and continuing misrepresentations thereafter constitute a default under the Security Agreement.

35.     The material adverse change, as described above, constitutes an Event of Default under the Security Agreement.  In particular, the Security Agreement provides on Page 4: "Each of the following shall constitute an Event of Default under this Agreement . . . . **Adverse Change.**  A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired."  RMG Sports' adverse change resulting from the loss of its largest client constitutes a default under the Security Agreement.

36.     RMG Sports' false statements to First Midwest and RMG Sports' adverse change constitute events of a default under the 2017 Note.  In particular, the 2017 Note provides

on Page 1: "Each of the following shall constitute an event of default ("Event of Default") under this Note . . . . **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished becomes false or misleading at any time thereafter." The Note further provides on Page 1: "Each of the following shall constitute an event of default ("Event of Default") under this Note . . . . **Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired."

37. Pursuant to the Security Agreement, upon the occurrence of an Event of Default under the Security Agreement, First Midwest is entitled to, among other things:

> **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.
>
> **Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.
>
> **Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured

-8-

by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

38.     As a result of RMG Sports' defaults under the Security Agreement and

pursuant to the terms of the Security Agreement, First Midwest has the right to take immediate

possession of the Collateral, and to exercise each and every one of the rights set forth in the Security Agreement.

39.     Pursuant to the Security Agreement, after taking possession of the Collateral, First Midwest has the right to sell, lease or otherwise dispose of the Collateral and to apply the proceeds of such disposition toward payment of the amounts due to First Midwest from RMG Sports.

40.     First Midwest has performed all of its obligations under its agreements with RMG Sports and Garber.

41.     RMG Sports has not paid amounts due and owing under the Loan Documents.  Garber has not paid amounts due and owing under the Guaranty.

**COUNT I – BREACH OF CONTRACT (NOTE AND SECURITY AGREEMENT)**

42.     First Midwest restates and incorporates the allegations of Paragraphs 1 through 41 of the Complaint as if fully set forth herein.

43.     RMG Sports' defaults under the Note and Security Agreement are breaches of contract.

44.     Pursuant to the Security Agreement, First Midwest is entitled to immediate payment of the entire outstanding principal amount of the Note, $1,181,669.04, plus interest, fees and expenses, including, but not limited to, attorneys' fees and expenses.

WHEREFORE, First Midwest prays that the Court enter judgment in its favor and against RMG Sports on Count I of the Complaint in the amount of $1,216,455.76, plus pre-judgment and post-judgment interest at the applicable rates, plus fees and expenses, including, but not limited to, attorneys' fees and expenses, and grant such other and further relief as the Court deems just and necessary.

## COUNT II – FORECLOSURE ON COLLATERAL

45.     First Midwest restates and incorporates the allegations of Paragraphs 1 through 44 of the Complaint as if fully set forth herein.

46.     First Midwest brings this count pursuant to 810 ILCS 5/9-601 of the Illinois Compiled Statutes to foreclose its security interest in certain personal property.

47.     As additional security for the Notes and Business Loan Agreement, RMG Sports entered into the Security Agreement with First Midwest.  The Security Agreement defines the categories of property that are Collateral for the loan.  The Security Agreement granted to First Midwest a continuing security interest in and right of set-off against the Collateral.

48.     As a result of the defaults under the Loan Documents, First Midwest is entitled to foreclose its security interests in the Collateral.

49.     Pursuant to the Security Agreement, First Midwest is entitled to immediate possession of the Collateral and is entitled to dispose of the Collateral.

WHEREFORE, First Midwest prays that the Court enter judgment in its favor and against RMG Sports on Count II of the Complaint, direct RMG Sports to immediately assemble the Collateral and turn over possession and control of the Collateral to First Midwest, authorize First Midwest to dispose of the Collateral, and grant such other and further relief as the Court deems just and necessary.

## COUNT III – BREACH OF CONTRACT (GUARANTY)

50.     First Midwest restates and incorporates the allegations of Paragraphs 1 through 49 of the Complaint as if fully set forth herein.

51.     Garber materially breached the Guaranty by failing to pay First Midwest the entire amount of the indebtedness given RMG Sports' default under the Loan Documents.

52.     The Guaranty is a legally valid, binding and enforceable agreement.

53.     First Midwest has performed all of its obligations under the Guaranty.

54.     Garber materially breached the Guaranty by failing to pay the obligations owed under the Guaranty.

55.     Garber has no legally recognized justification or excuse for breaching the Guaranty.

56.     Pursuant to the Guaranty, Garber is jointly and severally obligated to pay First Midwest $1,216,455.76, plus interest at the statutory rate, plus costs.

WHEREFORE, First Midwest prays that the Court enter judgment in its favor and against Garber on Count III of the Complaint in the amount of $1,216,455.76, plus pre-judgment and post-judgment interest at the applicable rates, plus fees and expenses, including, but not limited to, attorneys' fees and expenses, and grant such other and further relief as the Court deems just and necessary.

## COUNT IV – FRAUD

57.     First Midwest restates and incorporates the allegations of Paragraphs 1 through 56 of the Complaint as if set forth fully herein.

58.     The Defendants incurred the Debts and obtained money, property, or an extension, renewal, or refinancing of credit in connection therewith, by use of a false oral statement that is materially false, respecting the Defendants' expected continued success as a sports agent and agency, which statement amounted to false pretenses, was a false representation, and was in service of an actual fraud.

59.     As alleged above, Defendants omitted and failed to disclose to First Midwest, information including, without limitation, the end of Garber's representation of his largest client, Mr. Martinez.

60.     As alleged above, Defendants intentionally provided the 2017/18 Accounts Receivable Statement to First Midwest, with the intention that First Midwest would extend the maturity of RMG Sports' borrowings to September 5, 2018 and continue to provide financing and loans under the 2016 Loan Agreement.  Defendants knew that the 2017/18 Accounts Receivable Statement contained materially false information when it was provided to First Midwest.

61.     Each of the omissions alleged above concealed information that was necessary in order to avoid rendering the information that Defendants disclosed to First Midwest materially misleading.

62.     Each of the representations alleged above was untrue at the time it was made.

63.     Each of the omissions and misrepresentations alleged above was material.

64.     Each of the Defendants knew that the aforesaid misrepresentations were untrue and omissions misleading.  Each of the aforesaid misrepresentations and omissions were made with the intent that First Midwest would rely on them to extend the maturity of RMG Sports' borrowings to September 5, 2018 and continue to provide financing and loans under the 2016 Loan Agreement.

65.     First Midwest did in fact rely on each of the alleged omissions and misrepresentations in extending the maturity of RMG Sports' borrowings to September 5, 2018 and continuing to provide financing and loans under the 2016 Loan Agreement.

66.     But for the Defendants' material omissions and misrepresentations as alleged above, First Midwest would not have extended the maturity of RMG Sports' borrowings to September 5, 2018 and continued to provide financing and loans under the 2016 Loan Agreement.

67.     First Midwest justifiably relied upon Defendants' material omissions and misrepresentations of fact.

68.     As a direct and proximate result of Defendants' material omissions and misrepresentations of fact, First Midwest has been damaged in an amount in excess of $1,216,455.76.

WHEREFORE, First Midwest prays that the Court enter judgment in its favor and against the Defendants, jointly and severally, on Count IV of the Complaint in the amount of $1,216,455.76, plus pre-judgment and post-judgment interest at the statutory rates, plus costs, including, but not limited to attorneys' fees and expenses, and grant such other and further relief as the Court deems just and necessary.

Date: August 27, 2018                                         FIRST MIDWEST BANK


                                                            By: /s/ Matthew J. Stockl
                                                            One of Its Attorneys

Michael J. Small (ARDC No. 6207645)
Matthew J. Stockl (ARDC No. 6304087)
FOLEY & LARDNER LLP
321 North Clark Street
Chicago, Illinois  60654-5313
(312) 832-4500
(312) 832-4700 (Facsimile)
msmall@foley.com
mstockl@foley.com