**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FIRST MIDWEST BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 18 CV 05872** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RMG SPORTS GROUP LLC &** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **ROBERT M. GARBER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

First Midwest Bank ("First Midwest") filed this diversity action against RMG Sports

Group LLC ("RMG") and Robert M. Garber ("Garber") seeking, in part, to void an alleged

fraudulent transfer of property under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"),

740 ILCS § 160/1 *et seq*. (Dckt. #70.) Defendants have moved to dismiss Counts V, VI, and VII

of the Second Amended Complaint ("SAC"). (Dckt. #71.) For the reasons set forth below,

defendants' motion to dismiss is granted in part and denied with prejudice in part.

**I.     BACKGROUND**

The facts alleged by First Midwest in the SAC are as follows: Garber is the sole member

of RMG, a limited liability company registered in Florida. (Dckt. #70 at 1.) Through RMG,

Garber acts as a sports agent for professional baseball players. (*Id.*) On September 5, 2016,

RMG and First Midwest entered into a business loan agreement, pursuant to which First

Midwest would extend financing and make loans in the aggregate principal amount of up to

$1,200,000.00 to RMG. (*Id.* at 3.) The loans were secured by the assets of RMG under a

security agreement (the "Security Agreement"). (*Id.*) Under the Security Agreement, First

1

Midwest took a security interest in, among other things, RMG's inventory, money, other rights to payment and performance, and general intangibles. (*Id.* at 3-4.) To secure the loan, Garber, in his individual capacity, executed a commercial guaranty in favor of First Midwest, which includes all obligations of RMG Sports to First Midwest. (*Id.* at 4.)

In 2017, Garber and First Midwest agreed to extend the maturity of the note obligations from September 5, 2017 to September 5, 2018. (*Id.* at 5.) The extension was granted in reliance on RMG's expected income for 2017 and 2018, as provided by Garber. (*Id.*) In November 2017, Garber informed First Midwest that the expected income he had provided earlier in the year remained accurate. He failed to disclose, however, that his largest client, J.D. Martinez, had recently signed with another agency. (*Id.* at 6.)

On November 17, 2017, during the same month in which published reports showed Martinez had signed with another agency, Bash Baseball – a limited liability company – was formed in Florida through filings with the Florida Secretary of State. (*Id.* at 11.) On the day Bash Baseball was formed, RMG made a payment of $125.00 to Florida's Secretary of State. (*Id.*) Bash Baseball's sole member is Michael Garber, a relative of Garber's. (*Id.* at 19.) One month after its formation, on December 18, 2017, Bash Baseball received a $300,000.00 deposit from Michael Fiers ("Fiers"), a professional baseball player. (*Id.* at 11.) The transferred money was Fiers's agent fee for the 2018 baseball season. (*Id.*) First Midwest alleges that Fiers was a client of RMG "at all relevant times" and that either RMG or Garber "transferred or caused to be transferred" the $300,000.00 payment from Fiers to Bash Baseball. (*Id.*)

On February 5, 2018, less than two months after the Fiers payment, $200,000.00 was deposited into Garber's personal checking account. (*Id.* at 12.) Garber then made two payments totaling $187,800.00 to Kellermann Varela PL ("Kellermann"), a law firm. This money was

used by Kellermann to purchase a Miami Beach condo for Garber. (*Id.*) Garber subsequently sold the condo in April 2020. (*Id.*) On April 9, 2018 – at least six months after Martinez had signed with another agent – Garber informed First Midwest that he (1) no longer represented Martinez; (2) was unsure how he would be able to repay his financial obligations to First Midwest under the 2017 loan agreement; and (3) was contemplating filing for bankruptcy. (*Id.* at 7.) As of August 6, 2018, RMG is alleged to owe First Midwest $1,181,669.04 in principal, $29,427.76 in interest, and $4,118.40 in legal fees under the 2017 agreement. (*Id.* at 4.) First Midwest alleges that it has suffered damages in excess of $1,216,455.76. (*Id.* at 17.)

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While the required level of specificity 'is not easily quantified,' a plaintiff must allege 'enough details about the subject-matter of the case to present a story that holds together.'" *Bilek v. Fed. Ins. Co., et al.*, 8 F.4th 581, 586 (7th Cir. 2021), *quoting McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Pleading only "labels and conclusions" or only "a formulaic recitation of the elements of a cause of action" will not suffice, nor will pleading facts that are "merely consistent" with a defendant's liability. *Iqbal*, 556 U.S. at 678, *quoting Twombly*, 550 U.S. at 557. If a complaint fails to meet this standard, it may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Fraud claims are additionally subject to Rule 9(b)'s heightened pleading standard, under which a plaintiff must state with particularity the circumstances constituting fraud. Fed.R.Civ.P. 9(b); *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 478 (7th Cir. 2005). "A plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud – 'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic*, LLC, 836 F. 3d 770, 776 (7th Cir. 2016), *quoting United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F. 3d 849, 853 (7th Cir. 2009). This applies to both actual and constructive fraudulent transfer claims. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997). To plead fraudulent transfer with the necessary particularity, then, "the complaint must allege what (or how much) was transferred, when the transfer was made, how it was made, who made it, who received it, and under what circumstances." *In re Life Fund 5.1 LLC*, No. 09 B 32672, 2010 WL 2650024, at *3 (Bankr. N.D.Ill. June 30, 2010).

In applying these principles, the Court construes "the complaint in the light most favorable to the plaintiff[], accepting as true all well-pleaded facts and drawing reasonable inferences in the plaintiff[']s favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). However, the Court "need not accept as true statements of law or unsupported conclusory factual allegations." *Id.*

## III. ANALYSIS

On November 12, 2020 First Midwest filed the seven-count SAC against RMG and Garber. (Dckt. #70.) In Counts V, VI, and VII, First Midwest alleges that the $300,000.00 payment from Fiers to Bash Baseball and the $187,800.00 payment from Garber to Kellermann constituted fraudulent transfers under the IUFTA. First Midwest asks the Court to avoid the transfers at issue and enter a money judgment in First Midwest's favor in the amount of the

4

allegedly fraudulent transfers. (Dckt. #70 at 19, 21, 23.) Defendants have moved to dismiss each of these counts. (Dckt. #71.)

### A. Counts V and VI need not be dismissed where First Midwest adequately alleged actual and constructive fraud and joinder of Bash Baseball is feasible.

The IUFTA "protects against two kinds of fraudulent transfers: transfers with an actual intent to defraud and transfers which the law considers fraudulent (i.e., constructive fraud or fraud in law)." *Gen. Elec. Capital Corp.*, 128 F.3d at 1078. In Counts V and VI, First Midwest alleges that the $300,000.00 deposit Michael Fiers made to Bash Baseball on December 18, 2017 constituted both types of prohibited transfers.

Count V, brought under Section 5(a)(1), is premised on an actual fraud theory. The IUFTA provides that a transfer may be avoided if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS § 160/5(a)(1). Count VI is premised on a constructive fraud theory. Unlike with claims of actual fraud, a plaintiff pleading constructive fraud need not show intent. Rather, a transfer is constructively fraudulent if the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer" and "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." 740 ILCS § 160/5(a)(2). A presumption of constructive fraud is established where "(1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor had incurred obligations elsewhere; (3) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (4) after the transfer, the debtor failed to retain sufficient property to pay the indebtedness." *Gen. Elec. Capital Corp.*, 128 F.3d at 1079.

Defendants do not contest that First Midwest alleged sufficient facts showing RMG had the requisite intent to commit actual fraud, nor do they contest First Midwest's allegation that

RMG received no consideration in exchange for the transfer of $300,000.00.  (Dckt. #70 at 21.)

While actual and constructive fraud have somewhat different elements, defendants' motion to dismiss Counts V and VI turn on resolution of the same two issues.  First, defendants argue that First Midwest failed to adequately plead an actual or constructive fraud claim because the payment by Fiers to Bash Baseball did not constitute a transfer of RMG's property.  Second, defendants argue that both Counts must be dismissed under Rule 12(b)(7) even if First Midwest has alleged the circumstances of actual or constructive fraud because Bash Baseball is an indispensable party to both claims and it has not been joined.

### 1. First Midwest has sufficiently alleged that RMG made an impermissible transfer of its property.

"It may seem obvious in a fraudulent transfer action, but if a plaintiff cannot prove that the debtor's assets were transferred, the cause of action must fail, and the remaining elements are irrelevant."  *In re Angus Topics Inc.*, No. 12-40078, 2013 WL 5429426 at *2 (Bankr.S.D.Ill. Sept. 30, 2013).  To state a fraudulent transfer claim, whether actual or constructive, the plaintiff must allege that (1) there was a "transfer" and (2) the transfer was of the debtor's property.  *In re Glick*, 568 B.R. 634, 671 (Bankr.N.D.Ill. 2017).  Here, defendants argue that First Midwest failed to allege that RMG Sports had a property interest in the $300,000.00 given from Fiers to Bash Baseball.  (Dckt. #71 at 4.)

Under the IUFTA, the word "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  740 ILCS § 160/2(l).  "Congress intended transfer to be construed as broadly as possible."  *In re FBN Food Serv., Inc.*, 175 B.R. 671, 683 (Bankr.N.D.Ill. 1994).  "The word is used in its most comprehensive sense, and is intended to include every means and manner by

which property can pass from the ownership and possession of another . . ..." *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 444 (1901) (construing former section 1(30) of the Bankruptcy Act from which the UFTA definition was developed).[1]  As stated in the statute, transfers may be direct or indirect.  An indirect transfer might be composed of "various circuitous arrangements which have the effect of a fraudulent conveyance."  *FBN Food Serv.*, 175 B.R. at 683, (citing *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964, 969 n.4 (2d Cir.1977), *cert. denied*, 434 U.S. 1069 (1978)).  For example, Debtor D might direct Party A to pay money that A owes D to another party, B.  "In such a scenario, the debtor never has possession of the funds, but directs a third party to transfer those funds to a recipient.  For fraudulent transfer purposes, the transaction is treated the same as if the debtor transferred the funds, instead of the third party."  *FBN Food Serv.*, 175 B.R. at 683.  In other words, it is not necessary that the debtor make the transfer himself.  *Id.*

Here, Bash Baseball received a $300,000.00 deposit into its checking account on December 18, 2017.  (Dckt. #70 at 11.)  The money was "for an agent fee from Mike Fiers for the 2018 season."  (*Id.*)  First Midwest alleges that Fiers was a client of RMG at "all relevant times" and that RMG and/or Garber "transferred or caused to be transferred its interest in $300,000.00 to Bash Baseball, which paid no consideration therefor."  (*Id.*)  Defendants dispute this account of the facts and assert that Fiers was a client of Bash Baseball – not RMG Sports – when the money was transferred.  According to defendants, Fiers "transferred $300,000 directly

---

[1] Because the IUFTA is Illinois's iteration of a uniform act (11 U.S.C. §548), this Court "may look to cases decided under 11 U.S.C. § 548, as well as cases interpreting other states' versions of the Uniform Fraudulent Transfer Act (UFTA)" in order to interpret the Illinois act's meaning. *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007).  The IUFTA itself provides that its "general purpose is to make uniform the law with respect to the subject of this Act among states enacting it." 740 ILCS § 160/12.

to Bash Baseball in payment for services provided to him in connection with the 2018 season."
(Dckt. #71 at 4.)

Construing the complaint in the light most favorable to the plaintiff and drawing all
reasonable inferences in the plaintiff's favor, as it must, the Court finds that First Midwest has
alleged sufficient facts to support an inference that RMG orchestrated the transfer of
$300,000.00 from Fiers to Bash Baseball. First, the allegations suggest a connection between
RMG and Bash Baseball: Bash Baseball was formed in Florida the same month that RMG's
largest client signed with another agency, RMG made payments to Florida's Secretary of State
on the day Bash Baseball was formed, and Bash Baseball's sole member is a relative of Garber's.
By further alleging that Fiers remained a client of RMG "at all relevant times" and that RMG
"transferred or caused to be transferred" the $300,000.00 from Fiers to Bash Baseball, First
Midwest essentially alleges that Fiers, a client of RMG Sports at the time of the transfer, owed
RMG money and was directed by RMG to pay Bash Baseball instead. When the term is
construed as broadly as possible, such a transaction constitutes an indirect "transfer."

Like its definition of transfer, the IUFTA's definition of property is meant to cast a wide
net. It encompasses "anything that may be the subject of ownership." 740 ILCS § 160/2(j). To
have a protectable property interest, then, First Midwest must "have a legitimate claim of
entitlement" to the $300,000.00, rather than merely "an abstract need or desire for it." *Bd. of
Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Here, the SAC alleges that the
$300,000.00 from Fiers was First Midwest's "collateral" under the Security Agreement. (Dckt.
#70 at 11.) First Midwest's reply brief clarifies its position by classifying the money as either
"accounts receivable or proceeds of Collateral." (Dckt. #74 at 6.) Whether the money falls into
either of those categories depends, again, on whether Fiers contracted with RMG Sports for the

8

2018 season. By alleging that Fiers was a client of RMG Sports "at all relevant times," First Midwest indirectly asserts that he had so contracted. Defendants' reliance on *Diamond v. Hogan Lovells US LLP*, 224 A.3d 1007 (D.C. 2020), which holds that law firms do not have a legitimate claim of entitlement to future fees collected from former hourly-billed clients, is misplaced. (Dckt. #71 at 5.) If First Midwest's allegations are accepted as true, as they must be at this juncture, Fiers was not a former client at all. He remained a client of RMG Sports and a business certainly has a property interest in its own clients' payments for the services it provides to them.[2]

In sum, because First Midwest has sufficiently alleged an impermissible transfer of RMG's property within the meaning of the IUFTA, defendants' motion to dismiss Counts V and VI of the SAC pursuant to Rule 12(b)(6) is denied.

## 2. Bash Baseball is a necessary party and must be joined to this lawsuit.

Defendants next argue that Counts V and VI should be dismissed under Rule 12(b)(7) for failure to join Bash Baseball, which they categorize as an indispensable party. Though the defendants seemingly use "necessary" and "indispensable" interchangeably in their briefs, the two words are not synonymous within the context of a Rule 12(b)(7) analysis. A party is "necessary" if: (1) in that party's absence, the Court cannot accord complete relief among existing parties; or (2) that party claims an interest relating to the subject of the action and is so situated that disposing of the action in the party's absence may either (a) impair or impede the party's ability to protect the interest or (b) leave an existing party subject to a substantial risk of

---

[2] Should discovery show that Fiers was Bash Baseball's client for the 2018 season, defendants are correct that First Midwest would not have an interest in the $300,000.00. *See In re King & Ass.*, 295 B.R. 246 (Bankr. N.D.Ill. 2003) (finding that a creditor of a company owned by the defendant could not access the funds of a new company owned by the defendant's brother, even though the new company performed identical work for the same customers and operated at the same address with many of the same employees). At this stage, however, First Midwest has alleged facts sufficient to state a claim for both actual and constructive fraudulent transfer.

incurring inconsistent obligations. Fed.R.Civ.P. 19(a)(1). If a party is necessary, the Court must then consider whether joinder is feasible. Only in cases where joinder of a necessary party is not feasible must the Court determine whether that party is also "indispensable." And it is only when a party is both necessary *and* indispensable that a motion to dismiss under Rule 12(b)(7) will be granted. *Askew v. Sheriff of Cook County*, 568 F.3d 632, 634 (7th Cir. 2009). Here, Bash Baseball is a necessary party. Because joinder of Bash Baseball is feasible, the Court need not consider whether it is indispensable and may simply order that it be joined in the litigation.

Without citing any relevant case law, First Midwest asserts Bash Baseball is not a necessary party. In a fraudulent transfer suit, however, whether a transferee is a necessary party depends on the relief being sought. If the relief requires a return of the property, the transferee is necessary. *Burger King Corp. v. Am. Nat'l Bank & Trust Co. of Chicago*, 119 F.R.D. 672, 676 n.2 (N.D.Ill. 1988). In its SAC, First Midwest requests a judgment avoiding the transfer of $300,000.00 to Bash Baseball, permitting an attachment against the transferred funds or other property of Bash Baseball, and granting any other and further relief as the Court deems necessary. (Dckt. #70 at 19, 21.) To the extent that First Midwest asks the Court to grant an attachment against Bash Baseball's property, this clearly cannot be done in Bash Baseball's absence.

When considering First Midwest's request for avoidance of the transfer, the Court must turn to the statute itself. Section 9(b) of the IUFTA provides that, where a transfer is voidable, judgment may be entered against "(1) the first transferee of the asset or the person for whose benefit the transfer was made or (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee." 740 ILCS § 160/9(b). Although First

Midwest asserts that RMG and Garber constitute parties "for whose benefit the transfer was made," the case law makes clear that a debtor/transferor does not fall into this category.

When interpreting statutes, Illinois' courts apply the principle of *expressio unius*: when certain things are enumerated in a statute, the "enumeration implies the exclusion of all other things even if there are no negative words of prohibition." *Martis v. Pekin Mem'l Hosp., Inc.*, 917 N.E.2d 598, 604 (Ill.App.Ct. 2009); *In re D.W.*, 827 N.E.2d 466, 479 (Ill. 2005); *Metzger v. DaRosa*, 805 N.E.2d 1165, 1172 (Ill. 2004). Because the IUFTA lists the parties against whom an avoidance can be issued, and because the transferor is not one of those parties, the statute necessarily implies that a judgment of avoidance may not be issued against the transferor. *Riverdale Plating & Heat Treating, LLC v. Andre Corp.*, No. 15 C 3255, 2016 WL 3958885, at * 6 (N.D.Ill. July 22, 2016). Accordingly, at least one court interpreting the IUFTA has determined that plaintiffs seeking an avoidance may only recover against transferees. *In re Pritzker*, Nos. 02 CH 21426, 03 CH 7531, 2004 WL 414313, at *15 (Ill.Cir.Ct. Mar. 5, 2004) ("It appears to this Court that the Ten Defendants individual foundations are the proper entities from which to seek a return of the money, not the Foundation that transferred the money."). Plaintiffs seeking an injunction against further transfers, on the other hand, may recover from the debtor/transferor. *Id.*

Courts interpreting other states' versions of the UFTA have come to the same conclusion. *See, e.g., Riverdale Plating & Heat Treating* 2016 WL 3958885 at * 7 (dismissing a fraudulent transfer claim with prejudice "[b]ecause a creditor may not sue its own debtor for damages under the [Indiana Uniform Fraudulent Transfer Act]"); *Lacey Marketplace Assocs. II, LLC v. United Farmers of Alberta Co-op. Ltd.*, 107 F. Supp. 3d 1155, 1160 n.8 (W.D.Wash. 2015) (describing as "unremarkable" the proposition "that a money judgment may not be entered against the

11

transferring debtor as a 'person for whose benefit the transfer was made' because doing so would result in double liability for the debtor"); *Renda v. Nevarez*, 223 Cal.App.4th 1231, 1235-36 (Cal.App. 2014) (holding that a creditor could not recover damages from the transferor, even under the "for whose benefit" clause); *Yusem v. S. Fla. Water Mgmt. Dist.*, 770 So.2d 746, 749 (Fla.Dist.Ct.App. 2000) ("There is nothing in [Florida's UFTA] which provides that a creditor . . . that has a judgment against a debtor . . . can obtain an *additional* judgment against the same debtor, because the debtor fraudulently transferred funds to avoid his creditors.""). Furthermore, when interpreting the provision of the Bankruptcy Code upon which the IUFTA is based, the Eleventh Circuit has similarly held that the value of an avoidable transfer may not be recovered from the debtor/transferor. *In re Coggin*, 30 F.3d 1443, 1454 (11th Cir. 1994).

Finally, not allowing monetary damages to be issued against the transferor makes sense given the IUFTA's purpose. As the Court in *Riverdale Plating & Heat Treating* explained:

> After a debtor makes a fraudulent transfer, it is by definition unable to pay its debts or at risk of being unable to pay its debts. Allowing money judgments against the transferee helps the transferor's creditors because the judgment will increase the amount of money available to satisfy the transferor's debts; now the creditor who holds the judgment can recover from both the transferor's assets and the transferee's assets. But money judgments against the transferor for fraudulent transfer do nothing to increase the pool of assets available to the transferor's creditors.

2016 WL 3958885, at \*7. An additional money judgment against RMG in the amount of the allegedly fraudulent transfer would do nothing to increase the assets available to First Midwest to satisfy its existing claim against RMG. Accordingly, Bash Baseball is clearly a necessary party to this action and it may be the *only* party from whom First Midwest can recover the relief it seeks in Counts V and VI.[3] Because Bash Baseball is an LLC and its only member is a citizen of

---

[3] This is not to say that RMG is not an appropriate defendant. "[T]ypically a debtor is a party to a suit involving fraudulent conveyances." *Hoesman v. Sheffler*, 886 N.E.2d 622, 627 (Ind.App. 2008).

Florida, its inclusion in this action would not defeat diversity jurisdiction. Accordingly, the Court denies the motion to dismiss Counts V and VI under Rule 12(b)(7) and orders First Midwest to join Bash Baseball as a party in this action.

### B. Count VII must be dismissed where First Midwest failed to state a claim upon which relief can be granted.

Like Count V, Count VII is premised on an actual fraud theory. First Midwest alleges that, from February 9 through February 14, 2018, Garber paid $187,800.00 to Kellermann Varela PL ("Kellerman"), a law firm, so that the firm could purchase a condominium in Miami Beach for Garber. (Dckt. #70 at 12.) First Midwest also alleges that Garber made this transfer "with actual intent to hinder, delay, or defraud" First Midwest, thus engaging in an actual fraudulent transfer under 740 ILCS § 160/5(a)(1). Defendants move to dismiss, arguing that (1) First Midwest does not set forth facts that establish an actual transfer; (2) First Midwest fails to sufficiently allege who had an interest in the property that was transferred; and (3) a creditor cannot obtain an additional judgment against a debtor as the transferor. Only the third argument has merit.

In support of their assertion that Count VII of the SAC fails to set forth facts that establish an actual transfer, defendants cite to *Nationsbank, N.A. v. Coastal Utils., Inc.*, 814 So.2d 1227, 1230 (Fla. 4th Dist.Ct.App. 2002). However, this case – and all other case law reviewed by the Court – supports the opposite conclusion and emphasizes that the definition of transfer is meant to be interpreted broadly. *Id*. Simply put, the act of moving money from a personal checking account to a business is certainly a mode of parting with one's interest in the money. The $187,800.00 transaction thus constitutes a direct transfer from Garber to Kellermann. First Midwest also clearly alleges that Garber himself had an interest in this

property because the $187,800.00 came from Garber's personal checking account. Furthermore, as Garber's creditor, First Midwest may contest transfers of his personal property.[4]

Although First Midwest has alleged a transfer of Garber's property, it has nonetheless failed to state a claim upon which relief can be granted for the following reason. As explained in Section A(2), *supra*, state fraudulent transfer law attempts to protect creditors by expanding the pool of assets available to satisfy their claims. *See Riverdale Plating & Heat Treating, LLC*, 2016 WL 3958885, at *6; Glenda K. Harnad and Sonja Larsen, 37 Am.Jur.2d Fraudulent Conveyances §1 (2016) ("The purpose of a fraudulent transfer claim is the removal of obstacles which prevent the enforcement of a judgment."). Monetary damages under the IUFTA are not available against the debtor/transferor and, unlike with Counts V and VI, there is no other party First Midwest can join to attain an avoidance of this transfer. Kellerman parted with the money when it purchased the condo on Garber's behalf, and a judgment cannot be entered against the condo's unidentified seller, who constitutes a "good faith transferee who took for value." 740 ILCS § 160/9(b). Because a monetary fraudulent transfer judgment cannot be entered against Garber (the debtor/transferor) and because there is no other party against whom such a claim could be made, Count VII is dismissed.[5]

---

[4] In particular, because First Midwest alleges that Garber executed a Commercial Guaranty in favor of First Midwest in order to induce First Midwest to perform under the loan agreement, First Midwest is Garber's creditor. The IUFTA defines a "creditor" as "a person who has a claim," and defines "claim" as "a right to payment, whether or not the right is reduced to judgment." 740 ILCS § 160/2(c)-(d). *See also DFS Secured Healthcare Receivables Tr. v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 349 (7th Cir. 2004) (interpreting similar language in Indiana UFTA and concluding that a judgment holder was a "present creditor" for purposes of that statute even though it "did not receive a court judgment until after the asset transfer" in question).

[5] First Midwest and defendants spend much of their briefs discussing whether the purchase of the condo would fall within the homestead exemption in a bankruptcy case. The question is raised prematurely and the Court need not resolve it to decide this motion. In *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir 1989), a case cited by First Midwest, the Seventh Circuit found that a debtor's discharge should be denied where he converted nonexempt assets and other evidence shows

14

## CONCLUSION

For all of the above reasons, defendants' motion to dismiss is granted as to Count VII of the Second Amended Complaint and is otherwise denied. First Midwest is ordered to join Bash Baseball as a party to this action by October 6, 2021.

**ENTERED: September 16, 2021**

_____
**Jeffrey I. Cummings**
**United States Magistrate Judge**

---

fraudulent intent. This is not a bankruptcy proceeding and this Court need not determine which of Garber's debts would be discharged should he file for bankruptcy.